UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| AMY BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00042-JAW |
| | ) | |
| LOUIS DEJOY, Postmaster General | ) | |
| of the United States Postal Service | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON SUMMARY JUDGMENT**

An employer-defendant brings a motion for summary judgment against a former employee-plaintiff's claims pursuant to Federal Rule of Civil Procedure 56. The plaintiff, acting pro se and formerly employed by the United States Postal Service (USPS), brings claims of disability discrimination and related retaliation by her supervisor after she voiced safety and discrimination concerns during her brief tenure as a mail handler during the 2017 holiday season. The Court construes the plaintiff's claims to allege disparate treatment, failure to provide a reasonable accommodation, hostile work environment, retaliation, and violation of the Privacy Act. The Court concludes there is no genuine issue of material fact and grants the Postmaster General's motion for summary judgment on all claims.

## I.   PROCEDURAL HISTORY

On April 10, 2018, with the assistance of counsel, Amy Bailey filed an Equal Employment Opportunity Commission (EEOC) Complaint of Discrimination, alleging "Retaliation" and "Disability discrimination," against the United States Postmaster

General (Postmaster General).[1] *Decl. of Leslie Cedola* (ECF No. 65), Attach. 1, *EEO Compl. of Discrimination in the Postal Service* (*EEOC Compl.*). Ms. Bailey's EEOC Complaint specifically alleged that she has a "memory" disability and checked the form boxes for "Disability" and "Retaliation." *Id.* at 1. The EEOC accepted for investigation a total of six events underlying Ms. Bailey's allegations of "discrimination" and "discriminatory harassment/hostile work environment based on Retaliation (Reporting Injury—Safety Concern) and Disability (Cognitive Impairment/Memory)." *Decl. of Leslie Cedola*, Attach. 3, *Acceptance for Investigation* (*Acceptance for Investigation*); *id.*, Attach. 5, *Acceptance of Amendment* (*Acceptance of Amendment*). On October 25, 2019, the EEOC entered summary judgment against Ms. Bailey on all her claims. *Compl.*, Attach. 5, *EEOC Decision and Order Granting Agency's Mots. for Summ. J.*

On February 6, 2020, Ms. Bailey filed a pro se complaint against the Postmaster General in this Court asserting employment discrimination claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. *Compl.* at 1-13 (ECF No. 1). On December 18, 2020, the Postmaster General answered the Complaint and filed a partial motion to dismiss Ms. Bailey's ADA claim for lack of subject matter jurisdiction. *Def.'s Partial Mot. to Dismiss* (ECF No. 29); *Def.'s Answer to Pl.'s Compl.* (ECF No. 30). On January 8, 2021, Ms. Bailey responded, seeking to amend her Civil Cover Sheet and

---

[1]      Plaintiff's complaint before this Court originally named Megan J. Brennan in her capacity as Postmaster General. *See Compl.* (ECF No. 1). On September 10, 2020, the Magistrate Judge granted Plaintiff's motion to substitute Louis DeJoy after he became Postmaster General. *Pl.'s Mot. to Am. Compl.* at 1 (ECF No. 17); *Order* (ECF No. 19); FED. R. CIV. P. 25(d).

assert ten additional violations of federal law. *Pl.'s Resp. to Def.'s Partial Mot. to Dismiss* (ECF No. 32) (*Pl.'s Opp'n to Mot. to Dismiss*); *Corrected Civil Cover Sheet* (ECF No. 33). On January 21, 2020, the Postmaster General renewed his motion to dismiss Ms. Bailey's ADA claim for lack of subject-matter jurisdiction and sought to dismiss her additional claims. *Def.'s Reply in Supp. of Def.'s Partial Mot. to Dismiss* (ECF No. 36).

On March 25, 2021, the Court granted in part and denied in part the Postmaster General's partial motion to dismiss, dismissing all counts of Ms. Bailey's Amended Complaint except for those under the Rehabilitation Act and the Privacy Act of 1974. *Order Affirming the Recommended Decision of the Magistrate Judge* at 3-4 (ECF No. 40); *see also Recommended Decision on Def.'s Mot. to Dismiss* (ECF No. 37) (*Recommended Decision*).

On June 17, 2021, the Postmaster General filed his notice of intent to file a motion for summary judgment on Ms. Bailey's Rehabilitation Act and Privacy Act claims. *Def.'s Notice of Intent to Move for Summ. J.* (ECF No. 44). On June 30, 2021, Ms. Bailey emailed the Postmaster General's counsel that she "hope[d] to submit a Rule 15(c) change to include a request for reconsideration of Title VII of the Civil Rights Act of 1964 with supporting document of discrimination based on sex." *Decl. of Katelyn E. Saner, AUSA* ¶ 5 (ECF No. 66) (*Saner Decl.*); *id.*, Attach. 3, *06/30/21 Emails*, at 1. Following the parties' July 13, 2021, Local Rule 56(h) Pre-Filing Conference, the Court ordered Ms. Bailey to file any motion to amend her complaint with the proposed amended complaint by July 28, 2021. *Min. Entry* (ECF No. 50).

3

On July 28, 2021, Ms. Bailey filed a motion for leave to file an amended complaint but failed to attach her proposed amended complaint. *Mot. to Amend Compl. with Proposed Amend[ment] Separate* (ECF No. 52); *id.*, Attach. 1, *Mem. in Supp. of Pl.'s Proposed Mot. for Leave to File Am. Compl.* On August 6, 2021, the Court granted Ms. Bailey leave to file her proposed amended complaint by August 9, 2021. *Pl.'s Req. for Continuance* (ECF No. 58); *Order* (ECF No. 59). On August 9, 2021, Ms. Bailey filed a second motion for leave to file an amended complaint but again failed to attach a proposed amended complaint. *Pl.'s Mot. for Leave to File Am. Compl.* (ECF No. 60). On August 13, 2021, Ms. Bailey filed her third and final motion for leave to file an amended complaint. *Pl.'s Mot. for Leave to File Am. Compl.* (ECF No. 62). This time she filed her proposed amended complaint. *Id.*, Attach. 3, *Proposed 3rd Am. Compl.* (*Proposed Am. Compl.*). With her proposed third amended complaint, Ms. Bailey sought to add two claims: (1) a sex discrimination claim pursuant to 42 U.S.C. § 2000e-16, under Title VII of the Civil Rights Act of 1964, and (2) a claim regarding her performance review and dismissal arising under the Performance Rating Act of 1950. *Proposed Am. Compl.* at 2.

On September 3, 2021, the Postmaster General filed his response in opposition to Ms. Bailey's motions for leave to file an amended complaint. *Def.'s Opp'n to Pl.'s Mots. for Leave to File Am. Compl. (ECF Nos. 52, 60, 62)* (ECF No. 67). Finally, on September 24, 2021, Ms. Bailey replied to the Postmaster General's opposition to her motions for leave to file an amended complaint. *Pl.'s Resp. to Def.'s Opp'n for Mot. for Leave to File an Am. Compl. (ECF Nos. 52, 60, 62)* (ECF No. 70).

4

On January 13, 2022, the Court denied Ms. Bailey's request to amend her complaint. *Order on Pending Mots. to Amend* (ECF No. 71). On January 27, 2022, Ms. Bailey filed a motion objecting to the Court's January 13 Order. *Pl.'s Resp. to Order on Pending Mot. to Amend* (ECF No. 72).[2] The Postmaster General responded to Ms. Bailey's motion on February 9, 2022. *Def.'s Resp. to Pl.'s Obj. to Order Denying Pl.'s Pending Mots. to Amend (ECF No. 72)* (ECF No. 74). On March 8, 2022, the Court denied Ms. Bailey's motion for reconsideration of its order denying leave to amend. *Order on Mot. for Recons.* (ECF No. 75).

On March 29, 2022, the Postmaster General filed his motion for summary judgment and statement of material facts. *Def.'s Mot. for Summ J.* (ECF No. 88) (*Def.'s Mot.*); *Def.'s Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 87) (DSMF). On March 30, 2022, Ms. Bailey filed a rebuttal of all matters and addressing the court. *Pl.'s Rebuttal of All Matters and Addressing the Ct.* (ECF No. 89) (*Pl.'s First Mem.*). On April 15, 2022, the Postmaster General filed his response to Ms. Bailey's March 30 filing. *Def.'s Response to Pl.'s Rebuttal to All Matters and Addressing the Ct. (ECF No. 89)* (ECF No. 92.). On May 4, 2022, Ms. Bailey filed her response to the Postmaster General's motion for summary judgment, *Pl.'s Response to Material Submitted and Def.'s Filing of Summ. J.* (ECF No. 93) (*Pl.'s Opp'n.*), including her additional facts at Paragraphs 22.e through 22.ff. *Pl's Resp.* at ¶¶ 22.e-22.ff (ECF No. 93) (PSAMF). On May 17, 2022, the Postmaster General filed

---

[2]     The Court treated Ms. Bailey's response as a motion for reconsideration because that is the closest procedural vehicle recognized by the District of Maine Local Rules for a filing such as the one Ms. Bailey made. *See* D. ME. LOC. R. 7(f).

his reply, *Def.'s Reply in Supp. of Mot. for Summ J. (ECF No. 88)* (ECF No. 95) (*Def.'s Reply*), and his reply to Ms. Bailey's additional facts. *Def.'s Reply to Pl.'s Additional Facts Pursuant to Local Rule 56(d)* (ECF No. 96) (DRPSAMF).

On March 29, 2022, the Postmaster General filed a motion to seal and proposed to submit minimally redacted documents for the public record and seal the unredacted versions to protect third party privacy interests. *Def.'s Mot. to Seal Four Docs.* (ECF No. 86). On June 10, 2022, the Court granted the Postmaster General's motion to seal. *Order on Mot. to Seal* (ECF No. 98). On June 13, 2022, Ms. Bailey filed a memorandum in response to the Court's June 10 order. *Readdressing the Ct. and the Last Filing* (ECF No. 97) (*Pl.'s Second Mem.*).

## II. THE FACTS

### A. Summary Judgment Under the Local Rules

The District of Maine has promulgated local rules for the orderly disposition of motions for summary judgment. *See* D. ME. LOC. R. 56(a-g). Local Rule 56 establishes a process by which the Court may assess whether there is a "genuine dispute as to any material fact" and whether the "movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant, here the Postmaster General, has the obligation to submit with his motion for summary judgment "a separate, short, and concise statement of material facts." D. ME. LOC. R. 56(b). Each asserted fact must be "set forth in a separately numbered paragraph" and must be "supported by a record citation." *Id.* The Postmaster General's statement of material fact has complied fully with this local rule. DSMF ¶¶ 1-135.

In response to a motion for summary judgment and the movant's statement of material facts, the party opposing the motion "shall submit with its opposition a separate, short, and concise statement of material facts." D. ME. LOC. R. 56(c). In responding to the movant's statement, the non-movant "shall admit, deny or qualify the facts by reference to numbered paragraph of the moving party's statement of material facts and, unless a fact is admitted, shall support each denial or qualification by a record citation." *Id.* Specifically, the non-movant shall begin each statement "with the designation 'Admitted,' 'Denied,' or 'Qualified.'" *Id.* The non-movant then may present an opposing statement of material facts. *Id.* Ms. Bailey's submissions have failed to comply with either the spirit or letter of the local rule. *See Pl.'s Opp'n* at 1-22.

Ms. Bailey's failure to comply with the local rule has left the Court in an awkward position. In fairness to the Postmaster General, the Court may not act as her attorney and at the same time, the Court prefers to rule on the merits, rather than on procedural miscues. In view of Ms. Bailey's pro se status, the Court examined her other filings to understand the nature and basis of her claims.[3] *See Waterman v. White Interior Sols.*, No. 2:19-cv-00032-JDL, 2019 U.S. Dist. LEXIS 191506, at *4 (D. Me. Nov. 5, 2019) ("[T]he court must construe [a self-represented plaintiff's] complaint 'liberally'. . . [and] may consider other filings by a self-represented plaintiff, 'including his response to the motion to dismiss, to understand the nature and basis of his claims'" (quoting *Wall v. Dion*, 257 F. Supp. 2d 316, 318 (D. Me. 2003))). Thus,

---

[3]     For clarity and consistency, the Court refers to docket and page numbers assigned to Ms. Bailey's filings by the ECF system.

the Court draws from Ms. Bailey's submitted facts in her original Complaint, attached exhibits, and her response to the Postmaster General's motion for summary judgment. In recounting the facts, it has tried to be fair to both Ms. Bailey and the Postmaster General in assessing what facts are agreed to and what are in dispute.

### B.   Amy Bailey's Disability and Temporary Employment at USPS

Amy Bailey, along with ten other temporary employees, worked for USPS for a month during the 2017 holiday season to supplement the workforce at the Eastern Maine Processing & Distribution Center in Hampden, Maine. DSMF ¶¶ 1, 3-4, 10-11, 88; *Compl.*, Attach. 4, *Agency Mot. for a Decision Without a H'rg Pursuant to 29 C.F.R. § 1614.109(g)*, at 1. Her first day of work was November 27, 2017. DSMF ¶ 3. As a mail handler, Ms. Bailey sorted mail that came through the facility. *Id.*, Attach. 3, *Interrogs.*, at 3 (*Interrogs.*). Ms. Bailey's job responsibilities included lifting and sorting packages. DSMF ¶ 2. The positions held by Ms. Bailey and her co-workers were temporary and expected to end no later than January 5, 2018. DSMF ¶¶ 4-5, 11. Ms. Bailey and her co-workers were supervised by Brandon Pinkham, Wanda Curtis, and John Stephen Parlee. DSMF ¶¶ 13-15.

Ms. Bailey has a brain lesion and dissociative amnesia which "causes short term memory loss" and is aggravated by stress. *Interrogs.* at 6; *Compl.*, Attach. 6, *EEOC Designation of Representation Form*, at 5. At her job interview, Ms. Bailey alleges she showed a letter from the Maine Bureau of Rehabilitation Services (the "Schedule A Letter") that stated she "is an individual with a documented disability." DSMF ¶¶ 7-8. At her initial interview, Ms. Bailey approached the two men who interviewed her with her Schedule A Hiring letter. PSAMF ¶ 22.e. They inquired as

8

to what her needs may be, she relayed that she wanted to have access to her notebook application on her phone or carry around a notebook, they told her this likely would not be a problem, and she asked them how to contact the personnel office to get an accommodation in writing—a question they did not answer directly, instead instructing her to ask her training supervisor during training if she were chosen for the position.[4]  PSAMF ¶ 22.e.  None of Ms. Bailey's supervisors participated in her hiring interview, and Ms. Bailey did not show the Schedule A Letter to her supervisors.  DSMF ¶¶ 7, 9, 16.

### C.   Amy Bailey's Requests to Use the Notebook Application and Have Instructions Repeated

Because of her disability, Ms. Bailey "need[ed] to sometimes write things down" and occasionally wrote notes on her phone while performing her job.  *Interrogs.* at 4, 7.  Ms. Bailey alleges she made a request for an accommodation, so she could take notes and refer to them.  *Compl.* at 5.  The use of cell phones is generally prohibited on the workroom floor.  DSMF ¶ 20.  At training, during one of the first breaks, Ms. Bailey informed the person running the training that she knew it was against policy to have phones on the plant for safety purposes and asked who to contact to get her accommodation request in writing.  PSAMF ¶ 22.f.  The person leading the training told her that the accommodation would likely not be a problem

---

[4]     The Postmaster General qualifies PSAMF ¶ 22.e, saying Ms. Bailey "testified also at her deposition that the interviewer responded that 'it doesn't sound like it will be a problem' and advised [Ms. Bailey] to 'bring [her] request up to the supervisors in the plant.'"  DRPSAMF ¶ 22.e.  Having reviewed the relevant record, the Court accepts the Postmaster General's qualification and slightly adds to PSAMF ¶ 22.e to reflect the record.

but that Ms. Bailey would have to ask her supervisors on the plant for the accommodation.[5]  PSAMF ¶ 22.f.

Ms. Bailey alleges that she individually approached her three supervisors to ask if she could use the notebook application on her phone.  DSMF ¶¶ 23-28.  She further alleges that during these conversations, she said she had "minor memory issues" and a brain lesion.  DSMF ¶¶ 24, 27-28.  According to Ms. Bailey, she did not tell her supervisors that she had dissociative amnesia nor did she specifically state that she had a disability.  DSMF ¶ 31.  Ms. Bailey told Mr. Pinkham she needed an accommodation for her brain lesion and that she would like it in writing; he asked what it was and why she needed it.[6]  PSAMF ¶¶ 22.k, 22.m.  All three supervisors agreed that that Ms. Bailey could use the notebook application so long as she did not use her phone for any other purpose while on the floor.  DSMF ¶¶ 25, 27-28; PSAMF ¶ 22.n.  She then used the application "every day" during her month-long employment.  DSMF ¶ 32.  She did not have a physical notebook for use to take notes

---

[5]      The Postmaster General qualifies PSAMF ¶ 22.f, adding that Ms. Bailey testified at her deposition that the trainer responded that "it doesn't sound like it would be a problem" and also referred Ms. Bailey to her supervisors.  DRPSAMF ¶ 22.f (quoting *Aff. of Katelyn Saner*, Attach. 1, *Deposition of Amy Bailey* at 125:1-15 (*Bailey Dep.*)).  Having reviewed the record, the Court accepts the Postmaster General's qualification and adds slightly to PSAMF ¶ 22.f to reflect the record.

[6]      The Postmaster General admits that Ms. Bailey asked Mr. Pinkham if she could use a notebook application.  He objects, however, to the portion of the fact indicating that Ms. Bailey told Mr. Pinkham she had a disability, saying Ms. Bailey's "statement that she told [Mr.] Pinkham that she needed an accommodation for a disability should be stricken because it directly contradicts [her] own sworn deposition testimony."  DRPSAMF ¶ 22.k.  In her deposition, Ms. Bailey testified:

> Q: And in your conversations with Wanda and Steve and Brandon, did you ever say anything along the lines of I have a disability or did you use that word at all, to your memory?
> A: No, I don't think I used the words I have a disability.  I think I used the words that I have a brain lesion and it affects my memory.  That's—I don't think I—no, I didn't say it the other way. . .."

*Bailey Dep.* at 129:8-130:11.  The Court accepts the Postmaster General's objection and slightly alters PSAMF ¶ 22.k to reflect the record.

while working at USPS. *Pl.'s Second Mem.* at 29; PSAMF ¶¶ 22.bb, 22.o. Ms. Bailey saw no other worker with a notepad or notepad application except for a single instance when one higher level worker was trying to better organize the zip codes for his personal use. PSAMF ¶ 22.bb.

Ms. Bailey also alleges that in her conversations with Ms. Curtis and Mr. Pinkham, she requested the possibility of having task instructions repeated. DSMF ¶¶ 26, 29; PSAMF ¶ 22.g. Both supervisors agreed this was fine. DSMF ¶¶ 26, 29. Ms. Bailey asked them if she could get the approval in writing from the personnel department, which she was told was not necessary; she nonetheless asked her supervisors to find out how to have the accommodation in writing, and they said they would look into it. PSAMF ¶ 22.h.

Apart from the notebook application and repeated instructions, she did not make any other requests to be able to perform her responsibilities, and she admits she was able to perform all job duties. DSMF ¶¶ 36-37. Other staff members questioned why Ms. Bailey had her phone on her person because they were all required by policy to leave their phones in the breakroom or in their cars. PSAMF ¶ 22.aa. Ms. Bailey informed her colleagues that she had been granted an accommodation for her brain lesion and memory loss so as to reduce their concern that she may be terminated for carrying her phone on the plant floor. PSAMF ¶ 22.aa. Ms. Bailey's EEO affidavit states she "did not need to use the second request of repeated instructions." DSMF ¶ 35.

11

Ms. Bailey alleges that her USPS facility failed to make the accommodation she requested and otherwise claimed she never asked for one or that "all parties 'did' grant accommodation and knew about [her] disability." *Compl.* at 5.  For context involving other government agencies, Ms. Bailey states that at her previous job for the US Census, her supervisor immediately directed her to a number and department when she asked for an accommodation because it was policy at that job not even to inquire into the disability or requested accommodation.[7]  PSAMF ¶ 22.l.

### D. Amy Bailey's Interactions with Brandon Pinkham

The majority of Ms. Bailey's allegations centers on the conduct of her supervisor, Hampden Postal Plant Manager Brandon Pinkham, who, according to Ms. Bailey, "on many occasions violated protocols and established policies." *Compl.* at 5.  In her first week, Ms. Bailey reported Mr. Pinkham for what she perceived as a safety violation.  DSMF ¶ 41.  Ms. Bailey believes that Mr. Pinkham was the "head" of the alleged differential treatment directed at her by USPS, and that Ms. Curtis and Mr. Parlee were "complacent" but "weren't trying directly to affect [her]."  DSMF ¶ 127.  Nobody ever yelled at Ms. Bailey or physically threatened her, and she liked working at USPS when Mr. Pinkham was not around.  DSMF ¶¶ 125-26.  Ms. Bailey's claims regarding Mr. Pinkham revolve around three issues: Ms. Bailey's general

---

[7]     The Postmaster General admits that Ms. Bailey's US Census supervisor in 2020 directed her to a number and department but denies as unsupported by the record that this is a general government policy.  DRPSAMF ¶ 22.l.  The Court accepts the Postmaster General's objection as a qualification and alters the fact to clarify that it is Ms. Bailey's understanding that the stated policy was in effect at her prior job with the US Census.

exclusion by Mr. Pinkham at the workplace, the package-throwing incident, and the equipment tagging incident.

### 1.   Brandon Pinkham's Exclusion of Amy Bailey from Workplace Activities

Ms. Bailey asserts that Mr. Pinkham trained her co-workers on the use of a scanning device but refused to train her and called her "useless" when she tried to use it and it wasn't working. *Interrogs.* at 2; *Pl.'s Opp'n to Mot. to Dismiss* ¶ 46. She alleges that Mr. Pinkham subjected her to "Quid Pro Quo" harassment, including by assigning her "two to three time[s] the work in the first sorting area at a time of high mail volume," without the assistance of her assigned partner. *Mot. to Amend Compl. with Proposed Amendment Separate* (ECF No. 52), Attach. 1, *Mem. in Supp. of Pl.'s Proposed Mot. for Leave to File Am. Compl.* at 13. Mr. Pinkham "would come over to throw packages in the wrong [bins and] make disparaging remarks." *Id.* at 14. "It was so egregious that [co-workers] would wait until [Mr. Pinkham] was out of sight and rush to [her] aid." *Id.*

Ms. Bailey believes that Mr. Pinkham precluded her from informal training opportunities available to her co-workers, made her work alone for periods of time up to two hours while her co-workers worked in pairs, and limited her floor assignments. DSMF ¶¶ 113-17. With respect to informal training opportunities, Ms. Bailey claims Mr. Pinkham refused to take five minutes to train her to program a handheld device needed for independent assignment.[8] PSAMF ¶ 22.dd. Mr. Pinkham chose to train

---

[8]    The Postmaster General qualifies PSAMF ¶ 22.dd, clarifying "that in [Mr.] Pinkham's view it would not have been efficient to train the temporary employees in all areas given the short duration

another temporary employee on how to program the device so that he was not required to summon Mr. Pinkham for help each time he completed the task requiring the device. PSAMF ¶¶ 22.dd, 22.r.

With respect to working alone, Ms. Bailey claims Mr. Pinkham assigned her to work alone "[a]s retaliation for the unsafe work condition and safety concerns." DSMF ¶ 116. Ms. Bailey also alleges that Mr. Pinkham would assign only her to a workstation that usually required two employees. *Interrogs.* at 2. She claims that she "was constantly alone" for up to two hours, while other mail handlers worked in groups of two or three. *Id.*

Ms. Bailey further says that although she was told during her temporary employee onboarding that she would be able to train in other USPS departments, she was "passed up on greater than seven occasions" for the opportunity to try out other USPS roles. *Id.* at 1. Despite raising her hand two weeks in a row to be chosen for new assignments in several areas of the plant, Ms. Bailey was not selected for new training and assignments. PSAMF ¶ 22.t. She alleges that other employees were able to conduct this additional training and that of the ten people hired at the same time, she was the only one not trained in other departments. *Interrogs.* at 1. Ms. Bailey states that, unlike other employees, her "work duties were limited to three areas." *Pl.'s Opp'n to Mot. to Dismiss* ¶ 50; PSAMF ¶ 22.t.

---

of their employment." DRPSAMF ¶ 22.dd. The Court rejects the Postmaster General's qualification as beyond the scope of the fact and admits PSAMF ¶ 22.dd.

## 2.    The Package-Throwing Incident

Ms. Bailey alleges—although she did not see the act occur—that on December 18, 2017, Mr. Pinkham threw a package while they were sorting mail and the package struck her in the head. *Interrogs.* at 3; DSMF ¶¶ 42-43. After she was struck, she experienced a "headache and dizziness." *Interrogs.* at 3. Ms. Bailey sought to write a report about the incident with one of her other supervisors but was told to wait until it was too late to do so that day. *Id.* at 3-4. She took the following day off and alleges that upon her return to work her "card was pulled." *Id.* at 4. Ms. Bailey claims that she eventually "had no choice but to" file a report with Mr. Pinkham about the incident. *Id.*

On December 20, 2017, at Ms. Bailey's request, Mr. Pinkham filled out an accident report with Ms. Bailey regarding the package incident. DSMF ¶ 47. Ms. Bailey says that Mr. Pinkham "used time alone with [her], both filling out the accident report and the performance review" to inform her that if she filled out an accident report, talked with the union or "voic[ed] a complaint" then she "would not be hired again." *Pl.'s Opp'n to Mot. to Dismiss* ¶ 40; DSMF ¶ 48. She says that any part of Mr. Pinkham's incident report that she signed "was under duress, intimidation, and illegal threat of termination." *Mot. to Amend Compl. with Proposed Amendment Separate* (ECF No. 52), Attach. 1, *Mem. in Supp. of Pl.'s Proposed Mot. for Leave to File Am. Compl.* at 10. Ms. Bailey alleges that Mr. Pinkham "omitted in the file, in the accident report, and on the grievance form the material relevant fact

that he threw a package and was the unsafe worker involved in the incident." *Pl.'s Second Mem.* at 11.

The following day, Ms. Bailey submitted a statement to the union regarding her safety concerns about Mr. Pinkham throwing boxes.  DSMF ¶ 50.  She reported to the union Mr. Pinkham's behavior during the recording of the accident report and his mocking and related refusal to train her on a 3-prompt device so she could independently do her job.[9]  PSAMF ¶ 22.q.  Ms. Bailey was represented by counsel at the administrative phase and withdrew her package-throwing claim at the administrative phase.  DSMF ¶¶ 129-32.

### 3.    The Tagging Incident

Ms. Bailey asserts she was told during her training that she should "tag" any "broken and dangerous equipment" so that it could be removed from the floor and repaired.  *Interrogs.* at 1.  According to Ms. Bailey, she "tagged" several pieces of equipment, including a "jagged" cage hinge, but Mr. Pinkham removed the tags and discouraged her from raising her safety concerns.  *Id.* at 1-2; PSAMF ¶ 22.j.  Ms. Bailey alleges that a full-time employee filed a "union complaint" about the issue but was retaliated against by Mr. Pinkham.  *Interrogs.* at 2.  She also says that she was retaliated against "for removing a dangerously damaged cage from the floor [and] 'tagging' it."  *Pl.'s Opp'n to Mot. to Dismiss* ¶ 39.

---

[9]    The Postmaster General objects to PSAMF ¶ 22.q, saying that Ms. Bailey's "reference to 'harassment' and 'unequal treatment' should be stricken, as they represent a legal conclusion, rather than a fact."  DRPSAMF ¶ 22.q.  The Court accepts the Postmaster General's objection as a qualification and slightly alters PSAMF ¶ 22.o to objectively reflect the record.

### E.    Amy Bailey and Her Co-workers' Performance Evaluations

On December 26, 2017, Ms. Bailey and her co-workers were given performance evaluations by Mr. Pinkham.  DSMF ¶ 60.  The temporary workers were rated as outstanding, satisfactory, unsatisfactory, or not observed in six categories: work quantity, work quality, dependability, work relations, work methods, and personal conduct.    DSMF  ¶  61.    Ms.  Bailey  received  five  satisfactory  ratings  and  one unsatisfactory rating.  DSMF ¶ 62.  Three of Ms. Bailey's co-workers also received one unsatisfactory rating, and two received identical ratings to Ms. Bailey.  DSMF ¶ 69.

Ms. Bailey believes she was given a bad review because Mr. Pinkham found out that she had complained about him to the union.  DSMF ¶ 64.  Mr. Pinkham's notes  on  Ms.  Bailey's  performance  evaluation  stated  "unsafe  worker,  poor performance  and  attendance,"  and  he  also  checked  "no"  under  "[w]ould  [y]ou [r]ecommend [t]his [p]erson for [r]ehire or [r]etention."  DSMF ¶¶ 52-53, 62; *Pl.'s Second Mot.*, Attach. 7, *Employee Evaluation and/or Probationary Report* at 15; *see Interrogs.* at 4.  Mr. Pinkham cited Ms. Bailey for some absences, which she disputed. *Interrogs.* at 4.  Ms. Bailey alleges that other employees were not cited for having a similar number of absences, and that "[e]ven the people who had absences and didn't switch shifts were given exemplary in all areas."  *Id.*  At the start of her job, Ms. Bailey informed Mr. Parlee that she had asked for a day off at hiring for a medical procedure that could not be put off and that she needed to swap shifts, if possible. PSAMF ¶ 22.h.  Mr. Parlee recounted to Ms. Bailey that he understood because he

had undergone the same procedure in a different location and verbally granted the time off, but he did not change the time on the schedule.  PSAMF ¶ 22.h.  Right after she was done speaking with Mr. Parlee, another employee requested several days off; this employee was given a satisfaction for attendance.  PSAMF ¶ 22.i.

Mr. Pinkham did not understand Ms. Bailey to have a disability when he evaluated her performance and further did not know whether the two co-workers who received identical ratings to Ms. Bailey had disabilities.  DSMF ¶¶ 92, 95.  Ms. Bailey claims the notes section and recommendation were blank when she discussed the evaluation with Mr. Pinkham and that he added these notes and recommendation after she had initialed the evaluation.  DSMF ¶¶ 63-65.  Ms. Bailey claims that she asked for a copy of her "review," but Mr. Pinkham "wouldn't give [her] a copy" and "alter[ed] the document."  *Interrogs.* at 4; *Pl.'s Opp'n to Mot. to Dismiss* ¶¶ 34, 67.  According to Ms. Bailey, at least one of her co-workers was also not given a copy of his evaluation, and she does not know if her other co-workers received copies of their evaluations.  DSMF ¶ 67.

Apart from this litigation, Ms. Bailey did not submit any requests in writing to USPS for a copy of her evaluation or any requests to USPS asking for an amendment or alteration of her evaluation.  DSMF ¶ 68.  Ms. Bailey testified that she has not applied to any positions at USPS since her temporary role, nor has she applied to any jobs since working at USPS that required her to provide her USPS performance evaluation.  DSMF ¶ 73.

18

Ms. Bailey has held jobs since and never been fired or dismissed or disciplined for misconduct.  PSAMF ¶ 22.ee.  Instead, she was complimented at her Census job, worked for several welding companies, and currently works as a Shared Living Provider that requires a commitment of more than 14 hours per day 365 days per year.  PSAMF ¶ 22.ee.

### F.    Amy Bailey and Her Co-Workers' Reductions in Hours and Separations

As they are simply hired to work during the holiday seasonal push, it is the typical practice for USPS to cut back on temporary workers' hours and begin to separate them—meaning to relieve them of their work duties—even before their appointments end as peak holiday mail volume decreases.  DSMF ¶ 75.  When the holiday mail began to slow around Christmas, Ms. Curtis, Mr. Pinkham, and acting plant manager Eric Tiemann discussed letting some of the temporary workers go because there was not enough work for everyone.  DSMF ¶ 77.

Ms. Bailey asserts that, after her evaluation, she was told on three different days that there was no work and that she did not have to come to work.  *Interrogs.* at 5.  On December 27, 2017, the day after her evaluation, Ms. Bailey alleges that she was called by Ms. Curtis and told via voicemail not to come in because the holiday mail volume was slowing.  DSMF ¶ 78.  Ms. Bailey alleges that she missed the call and came into work where she observed "plenty of mail."  DSMF ¶ 79.  She alleges that Ms. Curtis again called her on the morning of December 28, 2017 and once more relayed to her that mail volume was low and told her not to come into work, even though it was Ms. Bailey's day off.  DSMF ¶¶ 81-83.  She nevertheless came into work

to pick up her paycheck and was told that the night before had been busy.  DSMF ¶ 81-82.

Ms. Bailey spoke with Support Specialist Edward Benedict about "being discriminated against because of [her] condition and retaliated [against] because of the incident [where she] got hit with a package."  *Interrogs.* at 5-6.  She had an approximately forty-minute conversation with him in which she discussed her concerns about the schedule, safety issues, and her intent to file an EEO complaint. DSMF ¶ 84; *Interrogs.* at 5.  The door to Mr. Benedict's office was open during this conversation.  DSMF ¶ 85.  None of Ms. Bailey's supervisors or Mr. Tiemann was inside or near Mr. Benedict's office.  DSMF ¶ 86.  Ms. Bailey claims Mr. Benedict told her that he would speak to Mr. Pinkham about Ms. Bailey returning to her shift and said that "[Mr. Pinkham] shouldn't be throwing packages."  *Interrogs.* at 5.  Mr. Benedict said their policy not to show favoritism was that the hours were to be evenly given to whomever was left working, but Ms. Bailey alleges that her card was removed before she was released for the season.  PSAMF ¶ 22.w.

Later that same day, Ms. Bailey received a call "an hour after talking with administration" informing her that she was "let go" from her position.  *Interrogs.* at 6-7.  Ms. Curtis told her that her services were no longer required because of low mail volume.  DSMF ¶¶ 87-88; PSAMF ¶ 22.v.  Ms. Curtis also called three of Ms. Bailey's co-workers the same day to separate their employment.  DSMF ¶ 91.  The remaining temporary workers were separated by January 5, 2018.  DSMF ¶ 98.  Ms. Bailey believes that Ms. Curtis' phone calls reducing her hours and separating her

employment were done at the direction of Mr. Pinkham and that either Mr. Benedict or someone else relayed to Mr. Pinkham her conversation with Mr. Benedict. DSMF ¶ 89. None of Ms. Bailey's supervisors understood Ms. Bailey to be disabled or knew whether she had engaged in any EEO activity when her hours were reduced and she was separated. DSMF ¶¶ 92-94.

### G.    Plaintiff's EEO Activity

Ms. Bailey was told there was no specific in-house personnel office at which to make her complaint.[10] PSAMF ¶ 22.u. Ms. Bailey first contacted an EEO counselor on December 27, 2017. DSMF ¶ 80. When Ms. Bailey went to Mr. Benedict's office to request personnel representation, Mr. Benedict would not acknowledge they had a personnel officer with whom she could discuss the level of malice she felt she was experiencing for asking for an accommodation. PSAMF ¶ 22.u. She told Mr. Benedict she had made a report with the EEO the previous day, he asked her to submit a statement, and they talked for more than thirty minutes about the topic. PSAMF ¶ 22.u; DSMF ¶ 84.

Apart from Mr. Benedict, Ms. Bailey did not tell any manager or supervisor about her EEO activity. DSMF ¶ 90. She was not interviewed by an EEO counselor until March 14, 2018. DSMF ¶ 80. None of Ms. Bailey's three supervisors or Mr. Tiemann knew about her EEO activity until they were asked to provide affidavits in

---

[10]    The Postmaster General denies PSAMF ¶ 22.u, saying that Ms. Baily in fact "initiated contact with the EEO office on December 27," which demonstrates she was able to make her complaint to the appropriate office. DRPSAMF ¶ 22.u. The Court accepts the Postmaster General's denial as a qualification and slightly alters Ms. Bailey's fact to indicate that she was told there was no specific in-house personnel office at which to make her complaint.

her EEO case in mid-2018.  DSMF ¶¶ 92-94.  Ms. Bailey, however, alleges that "[i]t is plausible that [Mr. Benedict] upstairs told [Mr. Pinkham about her intent to file an EEO Complaint] the minute [she] left the building."  *Pl.'s Second Mem.* at 31.

## H.    The Temporary Worker Position and Mail Handler Assistant Position

According to Ms. Bailey, in the last two weeks of the temporary workers' employment, she and her co-workers were informed that there would soon be a mail handler assistant position opening as well as a temporary position.  DSMF ¶ 99. Prerequisites to the mail handler assistant position included the Postal Exam 475 (the "postal exam") and an application.  DSMF ¶ 101.  As is general practice at USPS, selection to interview for the position was based on the applicants' scores on the postal exam and veterans' preferences.  DSMF ¶ 101.  Ms. Bailey has never taken the postal exam.  DSMF ¶ 102.  The temporary position did not require an application.  DSMF ¶ 100.

Ms. Bailey claims she spoke once each with Ms. Curtis and Mr. Benedict and also at least one union representative about whom she should speak to about an accommodation for the postal exam, but none of them could direct her to an appropriate office. [11]   DSMF ¶ 104; PSAMF ¶¶ 22.p, 22.u.  She also asked him how to get an accommodation to take the postal exam.  PSAMF ¶ 22.u.

---

[11]      The Postmaster General denies PSAMF ¶ 22.p, saying Ms. Bailey's assertion that she asked "every manager" how she could find a name or number to request an accommodation for the postal exam "directly contradicts [her] own sworn deposition testimony, which is clear that she did not ask [Mr.] Pinkham."  DRPSAMF ¶ 22.p.  Having reviewed the relevant record, the Court accepts the Postmaster General's denial as a qualification and slightly alters PSAMF ¶ 22.p to reflect the record.

Ms. Bailey did not specify what accommodation she was seeking during these conversations.  DSMF ¶ 106.  Ms. Bailey believes that if she had received an accommodation, she would have taken the postal exam and "would have probably scored rather high."  DSMF ¶ 109.  Ms. Bailey did not take the postal exam, did not apply to the mail handler assistant position, and was therefore not selected.  DSMF ¶¶ 102-103.  Instead, a strong 2017 holiday temporary worker was selected for the temporary position and then the mail handler assistant position.  DSMF ¶¶ 100-01.

## III.   THE PARTIES' POSITIONS

### A.   The Postmaster General's Motion for Summary Judgment

#### 1.   Disparate Treatment Claim

The Postmaster General first submits Ms. Bailey "cannot establish her prima facie case that her performance evaluation by [Mr.] Pinkham was the product of disparate treatment [because] there is no evidence that [Mr.] Pinkham understood [Ms. Bailey] to be disabled," and, even crediting her testimony that she told Mr. Pinkham she had "a memory issue and a brain lesion, . . . those statements alone do [not] amount to knowledge of a disability by [Mr.] Pinkham." *Def.'s Mot.* at 9.  The Postmaster General adds that Ms. Bailey "did not share her Schedule A letter with [Mr.] Pinkham, did not submit any medical documents to [Mr.] Pinkham," and, like Ms. Bailey, "other new employees have used notebooks to help remember information, and, in [Mr.] Pinkham's view, all new employees would benefit from writing down information." *Id.*

The Postmaster General then contends that even assuming Mr. Pinkham knew about Ms. Bailey's disability, "her prima facie case falters on causation because there

23

is no evidence that [her] disability factored into [Mr.] Pinkham's evaluation, let alone that [he] gave [her] the ratings he did because of [her] disability." *Id.* He explains how even Ms. Bailey herself "appears to believe that [Mr.] Pinkham's mindset in evaluating her was colored by [her] reporting of [his] alleged safety violations to the union." *Id.* at 10. He further contends that "[e]ven if [Ms. Bailey] could sustain her prima facie burden, [Mr.] Pinkham's appraisal of [her] performance was legitimate," and Ms. Bailey "will be unable to pass the pretext prong." *Id.*

The Postmaster General submits "there is no evidence that any decisionmaker with respect to [Ms. Bailey]'s hours and separation knew that she had a disability . . . [so she] cannot meet her prima facie case to establish that [her supervisors] reduced [her] hours or separated her employment because of [her] disability. *Id.* at 11. He further submits that "USPS has a legitimate non-discriminatory reason for [Ms. Bailey's] reduced hours and separation, and [Ms. Bailey] cannot establish pretext" because she, along with her co-workers, "was hired as a temporary employee in November 2017 to bolster the plant's workforce during the holiday rush . . . [and] was one of four temporary casuals that were let go on December 28, 2017. *Id.* at 11-13.

Finally, the Postmaster General contends that Ms. Bailey "cannot establish that her non-selection for either the temporary casual position or the mail handler assistant position is actionable discriminatory hiring" because she was "among the lowest performing temporary 2017 casuals whereas the selectee for the temporary role was among the highest performing of the 2017 casuals." *Id.* at 13. He explains how Ms. Bailey's argument that she was not rehired because of "USPS's alleged

limiting of her work responsibilities [and because Mr.] Pinkham's rating of her performance was artificially low" does not sustain Ms. Bailey's burden for two reasons: "Plaintiff's performance evaluation is not the product of disability discrimination [and] she was afforded the same initial multi-day training as her peers and admits she worked in three areas of the floor." *Id.* at 13-14. He further contends that "[w]ith respect to the mail handler assistant position, [Ms. Bailey] did not apply," *id.* at 14, and the legal exception "whereby employers may nevertheless be held liable when an employee does not apply for a position is inapplicable here . . . [because] nobody expressly discouraged [Ms. Bailey] from applying for the mail handler position." *Id.* at 15.

The Postmaster General concludes that even if Ms. Bailey "could establish a prima facie case, USPS has met its burden to establish a legitimate, nondiscriminatory reason for its nonselection of [Ms. Bailey]: the highest scoring applicants were offered an interview, without regard to protected status, and the strongest interviewee was then offered the position." *Id.* at 15. Moreover, "it is too speculative to conclude that [Ms. Bailey] ultimately would have been qualified and selected for the mail handler assistant position. *Id.* at 16.

### 2.   Reasonable Accommodation Claim

The Postmaster General explains that even though the "facts establish that nobody at USPS viewed [Ms. Bailey]'s requests to use the notebook application and/or have instructions repeated to be accommodation requests," Ms. Bailey was nonetheless "afforded exactly what she requested [because] every supervisor agreed

it was fine if she used her notebook application, and also agreed it was fine that she could have the possibility of instructions repeated." *Id.* at 17.

He contends that "[t]o the extent [Ms. Bailey] is also claiming that her alleged inquiries about who to ask for an unspecified accommodation for the postal exam amounts to a failure to accommodate in the context of hiring, [her] claim cannot withstand summary judgment" for three reasons. *Id.* at 17. First, Ms. Bailey "cannot establish that she was qualified to perform the essential functions of the mail handler assistant position." *Id.* Second, Ms. Bailey "cannot establish that she made a sufficiently direct and specific request for accommodation for the postal exam, let alone that she identified any reasonable accommodation. *Id.* at 17-18 (internal quotation marks omitted). Third, Ms. Bailey "similarly cannot establish the requisite cooperation on her part where her alleged statements do not identify what accommodation she was seeking." *Id.* at 19.

### 3. Hostile Work Environment Claim

The Postmaster General first sets out Ms. Bailey's alleged "universe of purported harassment by Mr. Pinkham" as follows:

> (i) [Mr.] Pinkham throwing a package at [Ms. Bailey]'s head; (ii) [Mr.] Pinkham assigning [Ms. Bailey] to limited areas of the workplace floor; (iii) [Mr.] Pinkham assigning [Ms. Bailey] to work alone for periods of time of up to two hours versus in a pair with another temporary casual; (iv) [Mr.] Pinkham once "rush[ing] over" to [Ms. Bailey] and someone named Bob while [Ms. Bailey] was using her notebook application and looking at [her], stating in a "raised voice" "If these Casuals aren't being useful, I can assign them elsewhere!"; (v) [Mr.] Pinkham three times making a comment in front of others that [Ms. Bailey] did not know how to program a device and that she was too stupid or useless to program it; (vi) [Mr.] Pinkham helping [Ms. Bailey] at her work area when [she] did not ask for help, which [she] viewed as "singling [her] out" and "a

26

little insulting," and (vii) [Mr.] Pinkham purportedly telling [Ms. Bailey] that she would be un-hirable if she filed an accident report after the package incident.

*Id.* at 19-20.

The Postmaster General contends that Ms. Bailey cannot prove her hostile work environment claim for three reasons. First, Ms. Bailey, "hired as a seasonal worker for a single month, cannot establish that [Mr.] Pinkham's conduct, or anyone else's conduct, was so severe and pervasive that it interfered with the terms and conditions of her employment and created an abusive work environment." *Id.* at 19. Second, Ms. Bailey "cannot establish that the alleged acts of which she complains rise above 'the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* at 23 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). Third, Ms. Bailey "has no evidence that any of the conduct that allegedly contributed to a hostile work environment was *because of* her disability." *Id.* at 23 (emphasis in original).

The Postmaster General adds that Ms. Bailey's "own affidavits are replete with her belief that [Mr.] Pinkham's actions directed at her were in retaliation for [her] safety reports," not because of her disability. *Id.* at 23. He concludes that, moreover, "with the exception of HC, [Ms. Bailey] and her coworkers were all noncareer employees that all ended up in the same position at the end [of] their employment: separated after holiday volume declined." *Id.* at 21.

### 4.   Retaliation Claim

The Postmaster General first explains how "[t]hroughout the course of [Ms. Bailey]'s EEO proceeding and this litigation, she has affirmed that the basis for her retaliation claim is 'reporting injury + safety concerns.'" *Id.* at 24 (quoting DSMF ¶ 129). He then submits "[i]t is well-established that raising safety concerns are not protected activity under the R[ehabilitation] A[ct], and thus cannot form the basis for a retaliation claim." *Id.* (citing *Young v. Brennan*, No. 16-12001-FDS, 2017 U.S. Dist. LEXIS 70032, at *12 (D. Mass. May 8, 2017)). The Postmaster General nonetheless "[f]or the sake of completeness" addresses all of Ms. Bailey's "possible protected activities," arguing the "record does not demonstrate any causal link between any protected activity under the R[ehabilitation] A[ct] by [Ms. Bailey] and any adverse employment event." *Id.* at 24.

The Postmaster General contends that to "the extent [Ms. Bailey]'s request to use her notebook application and/or have instructions repeated near the beginning of her employment in November 2017 . . . can be construed as a request for reasonable accommodation, USPS does not dispute that such request amounts to protected activity." *Id.* at 24. He further contends, however, that "none of [Ms. Bailey]'s supervisors understood these requests to be request[s] for accommodation" and thus there is "no basis for inferring that anyone retaliated against [Ms. Bailey]" or that "had [Ms. Bailey] not asked to use the notebook application, she would not have received an identical performance evaluation and/or would not have been separated in the first wave." *Id.* at 25.

28

The Postmaster General then submits that Ms. Bailey's "accident report dated December 20 . . . is a quintessential report following a workplace injury that has no nexus to any unlawful practice under the R[ehabilitation] A[ct]." *Id.* He further submits that Ms. Bailey's "union statement dated December 21, in which she write[s] about the safety issue so far while working for the USPS . . . is also not protected activity" because "the subject matter of [her] union statement is about safety concerns, with no reference to her disability or any perceived disability-based discrimination." *Id.* at 25-26 (internal quotation marks omitted).

He then submits that although Ms. Bailey's "separation on December 28, followed closely on the heels of her initiation of EEO contact on December 27 . . . [t]here is no evidence that the decisionmakers . . . knew about [Ms. Bailey]'s EEO activity." *Id.* at 26. Finally, he argues that "even if [Ms. Bailey] could establish a prima facie case for retaliation, USPS has legitimate, non-retaliatory reasons for all the actions of which [she] complains and [she] cannot meet her burden to establish pretext." *Id.*

### 5.    Privacy Act Claim

The Postmaster General explains that Ms. Bailey "appears to be alleging both an access claim and alteration claim" and contends that she "cannot establish a violation of the Privacy Act" for three reasons. *Id.* at 28-29. First, Ms. Bailey "did not exhaust her administrative remedies [because she] never submitted a Privacy Act request in writing requesting access or amendment to her performance evaluation in accordance with USPS's procedures." *Id.* at 29. Second, Ms. Bailey's "access claim is moot [because she] was provided with a copy of her evaluation in her EEO proceeding,

and again in this litigation." *Id.*   Third, "with respect to [Ms. Bailey]'s alteration claim, USPS's 'non-correction' of [Ms. Bailey]'s performance evaluation falls outside the bounds of a Privacy Act violation" because her "disagreement with her performance evaluation falls squarely within the definition of 'prohibited personnel practices' and is thus preempted by the [Civil Service Reform Act of 1978 (CSRA)]." *Id.*

## B.   Amy Bailey's Opposition

### 1.   Witness Tampering

Ms. Bailey first presents her concerns regarding the witness testimony submitted to the Court by Defendants in the form of the declarations of Mr. Pinkham, Mr. Parlee, Ms. Curtis, and Mr. Benedict. *See Pl.'s Opp'n* at 1-10.  She submits that the Postmaster General has "apparently had new unverified witness testimony that [is] clearly not written by the respondent of their own accord," and argues that the Postmaster General "cannot be a witness to the proceedings, as they are not a disinterest[ed] third party arbiter, instead directly involved, [which leads to a] presumption of undue influence of testimony, coerced . . . [an] unacceptable practice in law . . . witness tampering." *Id.* at 1-2.  She explains that although "[f]rom the time of the EEOC proceedings in 2018 until January 2022, [she] kept professional distance in case the witnesses needed to be called for their account[, defense counsel] has not made the same effort to not unduly influence the testimony of witnesses." *Id.* at 2-3.

30

Ms. Bailey contends that because of this interaction with the witnesses, "the testimony must be thrown out as it is bias[ed], tainted, and weighted to one party." *Id.* at 4. She further contends that "[a]gents under color of law and outside their authority . . . have then and now present altered document[s], made and make false claims, and officially bear false witness on affidavits and others conspired in concert to do the same," *Pl.'s First Mem.* at 2, and insists that "[o]nce the court officers became aware of the false statements made in both [Mr.] Pinkham's and conspiring parties' affidavits, all request by defense should have been denied and null." *Id.* at 3-4. She alleges she has been "denied the ability to question those who . . . bear false witness against [her]," because she "was informed by the Court in conference [she] can question no witnesses[, y]et defense is again submitting request of adding affidavits to the record without notice." *Id.* at 4.

Ms. Bailey expresses her related concern that Mr. Pinkham and the defendants are "now trying to change statements to meet the evidence that is undisputed and remove the inconsistencies and falsehoods in previous testimony also made under penalty of perjury . . . clearly made by an interest[ed] party in claim under intimidation and not from a disinterest[ed] third party arbiter." *Pl.'s Opp'n* at 7. She reiterates that she does "not consent to the proceedings moving forward if the Court refuses to acknowledge and deal with the matter of Unclean Hands for Defense giving clearly false testimony into the record," especially that of Mr. Pinkham's alleged lack of knowledge regarding Ms. Bailey's complaint filed with the union. *Id.* at 10. She "reject[s] all Documents such as the Document 81 and all exhibits filed 03/29/2022 as

again it has been prepared by an interested party and includes Exhibits that [Mr. Pinkham] not named as a defendant rather a witness cannot have access to [because] it is clearly tampering with the witness as the interest[ed] party." *Pl.'s Second Mem.* at 32.

### 2. Amy Bailey's Harm

Ms. Bailey contends she was "harmed, bullied, discriminated against, mistreated by management, [and] retaliated against for participating in protected activities (those clearly stated by EEOC as requesting an accommodation, among others)." *Pl.'s First Mem.* at 1. She further contends that because she "assert[ed her] rights under contract and under the Constitution of the United States, The Bill of Rights and the labor contract," her "job duties were altered, [she] was mistreated by staff, harassed, [received] unwanted attention from [her] supervisor . . . [and] documents were altered without [her] knowledge or consent." *Id.* at 1-2. She asserts her "injury is not a perceived safety violation it is a safety violation committed by the neglect of the supervisor responsible for safety." *Pl.'s Second Mem.* at 11.

Regarding her hostile work environment claim, Ms. Bailey submits "[h]ostile [e]nvironment [h]arassment covers . . . examples of [Mr. Pinkham] making derogatory or intimidating references to an employee's mental or physical impairment," specifically because he "followed through on his threat that [she] would not be hired if [she] insisted on filling out the accident report." *Id.* at 32. Ms. Bailey submits that the Postmaster General's "claim of a legitimate reason does not answer the conduct or abuse [she] endured at the whim of [her] supervisors for the time [she] was working

32

[at] the USPS" and nor does it answer the "false statements, or the false reporting on employment documents or for any other matter." *Id.* at 24.

### 3.      Amy Bailey's Interaction with Brandon Pinkham

Ms. Bailey asserts that Mr. Pinkham "daily from the time [she] attempted to correct the safety issue that occurred on the first or second day on the plant floor until [her] final termination harassed [her], attempted to intimidate, threatened with negative employment outcomes and followed through to dissuade [her from her] legal right to report an injury caused by the careless neglect of [her] supervisor." *Id.* at 25-26.  She submits that when she "made the request for an accommodation, [she] tried to make amends explaining this was the instruction during training [but i]t did not matter, [Mr. Pinkham] was determined to find any and all excuses to put [her] in an inappropriate workspace, in unsafe work conditions, deny [her] training, threaten [her] job and future employment, deny [her] section appropriate staffing, and alter workplace document[s] with untrue statements." *Id.* at 14.  She further submits that Mr. Pinkham "had no reason to believe [she] was not a dependable worker other than to terminate [her] as an abuse of authority and then terminate two other people simply because they worked in the same space [she] did and did not alienate [her] as other staff did." *Id.* at 25.

Ms. Bailey contends "[i]t was targeted treatment that started right after the first interaction on the floor about an unsafe work condition [that Mr.] Pinkham was responsible for . . . [even before she] knew he was a supervisor, or asked him for an accommodation." *Id.* at 11.  She argues "[b]ias is all that needs to be established for [her] truth and fact to be recognized by the court [because she does] not have to show

intention or [Mr.] Pinkham's thoughts or feelings . . . [or] to do a Vulcan mind meld which is what Defense is saying is the standard of the Court and find out [Mr.] Pinkham's true intention." *Id.* at 12-13.

She explains how she "was not trained on a device that required 3-4 prompts and had to endure repeatedly insults in front of other workers from [Mr. Pinkham] when [she] had to retrieve him to program the device to independently do [her] job," and can find no other reason for his actions "other than he believe[d her to be] incompetent because [she] asked for an accommodation and told him [she] had a disability." *Id.* at 12.

### 4. Ms. Bailey's Actions as They Related to Potential Future Employment with USPS

Regarding her postal exam accommodation request, Ms. Bailey clarifies she "never asked for a specific accommodation for the Postal Exam [because she] could find no one when [she] said [she] needed the accommodations . . . [she] got the same answer from everyone, there is no Personnel Department." *Id.* at 29. She asks: "what was [she] suppose[d] to do? Again was [she] to tell all of the supervisors [her] exact need when they were not the ones to set up the postal exam?" *Id.* She then contends that she may well have applied for another position altogether if she had received the support she sought. She queries: "who says I would have applied for that position, why not a clerks position, or a rural carrier, or maybe as I did apply a janitors position and have proof of application acceptance and got no response because of my poor performance review." *Id.* at 30. She submits if she "had take[n] the exam, there cannot be a negative outcome that [she] would under no circumstance ever be chosen

34

for a postal position in the next year [because she] could eas[il]y and likely [have] applied for the seasonal mail handler position and gained employment." *Id.*

### C.    The Postmaster General's Reply

The Postmaster General contends that the "additional facts offered by [Ms. Bailey] in her Opposition . . . underscore that no triable issues exist for her Rehabilitation Act . . . and Privacy Act claims to survive." *Def.'s Reply* at 2.

#### 1.    Disparate Treatment Claim

The Postmaster General submits that "[t]o establish disparate treatment based on disability under the R[ehabilitation] A[ct], [Ms. Bailey] must show, at minimum, that her unwanted performance evaluation and separation a week prior to her outside end-of-employment date would not have occurred but for her disability." *Id.* (internal quotation marks omitted).  He argues that Ms. Bailey simply "cannot meet her causation burden because [she] herself has linked these two allegedly adverse employment events by [Mr.] Pinkham with [her] safety complaints to the union." *Id.* at 2-3.

The Postmaster General further submits that "[i]n any event, [USPS] established a legitimate reason for [Ms. Bailey]'s evaluation and early separation: [Mr.] Pinkham did not consider her to be a dependable worker and the holiday mail volume was beginning to slow after Christmas such that there was not enough work for all of the temporary employees." *Id.* at 3.  He explains how "in [Mr.] Pinkham's view, in addition to what he viewed as attendance issues, [Ms. Bailey] was also not a safe worker and a poor performer, whereas [the temporary employee selected to continue employment at USPS] completed his assignments without unnecessary supervision and was a good worker." *Id.* at 4.  Although Ms. Bailey "speculates that

35

[Mr.] Pinkham concocted a scheme of giving two of [her] co-workers who were helpful to and seen with [her] also 'undeserved' performance evaluations and separating them also on December 28 to cover up his true discriminatory motive," Ms. Bailey's "speculation of this scheme is too much of an inferential leap to be credited on summary judgment, especially where one other temporary employee (not identified as helpful to [Ms. Bailey]) received also one unsatisfactory on his performance rating, the temporary employees' employment was necessary so long as mail volume dictated, and another temporary employee (not identified as helpful to [Ms. Bailey]) was separated also on December 28." *Id.*

## 2.      Amy Bailey's Harassment Claim

The Postmaster General notes Ms. Bailey alleges her most notable treatment related to her disability was Mr. Pinkham's refusal to train her on how to program a device she used at USPS. *Id.* at 4.  He asserts that "[n]ot training a temporary employee on how to program a scanning device falls short of the abusive high-water mark required to impose liability under the R[ehabilitation] A[ct]." *Id.*  He thereby submits that "the identified alleged conduct by [Mr.] Pinkham falls short of actionable abusive conduct under First Circuit jurisprudence," and, moreover, Ms. Bailey "has not met the stringent but-for causation standard for [Mr.] Pinkham's alleged conduct that is minimally required under the R[ehabilitation] A[ct]." *Id.* at 5.

## 3.      Reasonable Accommodation Claim

Regarding Ms. Bailey's reasonable accommodation claim, the Postmaster General contends Ms. Bailey "was afforded exactly what she requested to perform her job." *Id.* at 5.  He further contends that allowing Ms. Bailey to use her notebook

application "was an effective accommodation and reflects precisely how such requests should be handled at the lowest level, especially where [Ms. Bailey]'s temporary employment was expected to last for only a month and delay could have ensued if, alternatively, [her] supervisors had submitted [her] request to the district or area committee for processing." *Id.* He submits this "lack of written confirmation that [Ms. Bailey] could use the notebook application does not amount to a failure to accommodate." *Id.*

### 4.   Amy Bailey and the Postal Exam

As for Ms. Bailey's allegation that she did not receive an accommodation to take the postal exam and thus was not hired for the available position at USPS, the Postmaster General submits Ms. Bailey does not claim to have "made any specific or direct request for an accommodation relating to the postal exam, nor does [she] link any such request to her disability." *Id.*

He further submits "[t]o trigger the interactive process, [Ms. Bailey] must have specifically and directly requested an accommodation, meaning that she must have at least explained how a particular accommodation relating to the postal exam would be linked to her disability [and t]hat burden is unmet here." *Id.* at 6. He insists that nonetheless, "even if the interactive process was prompted, [Ms. Bailey] bears at least some responsibility for identifying what accommodation she was seeking," which she "has not identified what accommodation she was seeking for the postal exam to date." *Id.* Finally, the Postmaster General concludes that even if Ms. Bailey "had requested and been granted said accommodation, it is wholly speculative to conclude that she

ultimately would have been both qualified for the mail handler assistant role (the role that required the postal exam) and also selected for the role among the at least nine who applied" and "[t]o conclude such requires the factfinder to stack speculation on top of speculation that [she] would have applied for the vacancy, would have taken the exam, would have scored highly, would have been offered an interview, and would have been selected for the role." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'"  *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).  The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  Then, a "court views the facts and draws all reasonable

38

inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[A]s a general rule, [courts] are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." *Dutil v. Murphy*, 550 F.3d 154, 158 (1st Cir. 2008); *see Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 15 (1st Cir. 1990) (a court should liberally construe a pro se filer's pleadings); *Doyle v. Town of Falmouth*, No. 2:19-cv-00229-NT, 2019 U.S. Dist. LEXIS 183409, at *4-5 (D. Me. Oct. 23 2019) ("A document filed *pro se* is to be liberally construed, . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal quotations and citation omitted)).

V.     **DISCUSSION**

A.     **Disparate Treatment Claim**

Ms. Bailey claims that she received a low performance evaluation, was separated early, and was not selected for the available temporary worker role because of her disability.  The Court concludes Ms. Bailey cannot sustain her disparate treatment claim because USPS had legitimate nondiscriminatory reasons for Ms. Bailey's performance evaluation, early separation, and non-selection for continued employment and Ms. Bailey does not meet her burden of proving these reasons are pretextual.

1.     **Legal Standard**

In the absence of direct evidence of discrimination, the First Circuit employs the *McDonnell Douglas* burden-shifting framework to evaluate whether a plaintiff can make out an inferential case of the alleged discrimination.  *See Diaz v. City of Somerville*, No. 22-1137, 2023 U.S. App. LEXIS 2581, at \*13 (1st Cir. Feb. 1, 2023) ("Federal law employs the classic *McDonnell Douglas* framework in Title VII cases in which the plaintiff does not offer direct evidence of discrimination"); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Lockridge v. Univ. of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010).  Under this analysis, a plaintiff must first show that a prima facie case of disability discrimination exists.

Under the *McDonnell Douglas* burden shifting analysis, Ms. Bailey carries the initial burden to establish a prima facie case of disability discrimination. "Pursuant to that analysis, 'an [applicant] must first establish a prima facie case that (1) she

40

has a disability; (2) she is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of her job; and (3) her employer adversely treated her based in whole or in part on her disability.'" *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768 (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722); *see also Swanson v. Correct Care Sols., Inc.*, No. 1:15-cv-383-GZS, 2017 U.S. Dist. LEXIS 120356, at *5 (D. Me. Aug. 1, 2017) (prima facia burden is "relatively light"), *report and recommendation adopted*, No. 1:15-cv-383-GZS, 2017 U.S. Dist. LEXIS 142775, (D. Me. Sept. 5, 2017); *Ridge v. Cape Elizabeth Sch. Dept.*, 101 F. Supp. 2d 16, 18 (D. Me. 1999) (prima facie burden is "de minimis").  "If the employee produces prima facie evidence of each element, the burden shifts to the employer to establish that it had a legitimate, nondiscriminatory basis for its actions; if the employer does so, 'the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action.'" *Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768 (quoting *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 15, 66 A.3d 7)).

"Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." *Burnett v. Ocean Props., Ltd.*, 327 F. Supp. 3d 198, 234 (D. Me. 2018) (quoting *Blackie v. State of Me.*, 75 F.3d 716, 725 (1st Cir. 1996)).  A claimant does not need to show that the adverse action was taken wholly because of one's disability, only that the adverse action was in part due to the claimant's disability.  *See Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48 (citing *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 20 (1st Cir. 2002)); *Soto-Ocasio*

41

*v. Fed. Express Corp.*, 150 F.3d 14, 18 (1st Cir. 1998); *Lyons v. La. Pac. Corp.*, 217 F. Supp. 2d 171, 176-77 (D. Me. 2002). The third element requires Ms. Bailey to establish, at a minimum, that her disability was the but-for cause of the allegedly adverse action. *See Palmquist v. Shinseki*, 689 F.3d 66, 77 (1st Cir. 2012) ("The only way to give the wording of section 501 any practical effect is to find that the ADA's but-for causation standard controls whether a defendant is liable for retaliation").[12] "This burden can be carried with either direct evidence of discriminatory animus or with sufficient circumstantial evidence." *Adams v. N. New England Tel. Operations*, L.L.C., No. CIV. 08-296-B-W, 2009 U.S. Dist. LEXIS 80473, at *11 (D. Me. Aug. 27, 2009).

##          2.      Analysis

Viewing the facts in the light most favorable to Ms. Bailey, the Court concludes a reasonable juror could find that Mr. Pinkham adversely treated Ms. Bailey based in part on her disability but nonetheless finds no genuine issue of material fact because Mr. Pinkham and USPS had legitimate nondiscriminatory bases for providing Ms. Bailey with an unfavorable performance evaluation, separating her approximately one week before the latest end date of her appointment, and not

---

[12]       There is a circuit split regarding whether the causation standard for an employment discrimination claim under section 504 of the Rehabilitation Act is the same as or higher than the ADA standard. "This issue [of which causation standard to apply], in the employment context, remains an open question in the First Circuit." *Paraskevopoulos v. Cent. Me. Med. Ctr.*, No. 2:17-cv-00166-JAW, 2019 U.S. Dist. LEXIS 164285, at *13-15 (D. Me. Sep. 25, 2019); *see Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) ("We therefore regard the applicability of § 504 and its sole causation test in this federal employment suit as an open question; but one that we need not reach here"). The Court need not reach this question here because it concludes USPS had a legitimate reason for evaluating, separating, and not rehiring Ms. Bailey as it did.

selecting her for a continued position at USPS.[13]   To rebut a prima facie case of disparate treatment, USPS must "'clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5-6 (1st Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

Regarding her performance evaluation, Ms. Bailey received five satisfactory ratings and one unsatisfactory rating.  DSMF ¶ 62.  Ms. Bailey herself appears to believe that Mr. Pinkham's mindset in evaluating her was influenced first and foremost by her reporting of Mr. Pinkham's alleged safety violations to the union. DSMF ¶ 64 ("I was giv[en] a bad review when [Mr. Pinkham] found out that I had complained about him with the union"); ("The review seems to have come about suddenly without warning right after Christmas . . . when [Mr. Pinkham] may have been made aware that I had filed a complaint with the Union Representative").  Moreover, three of Ms. Bailey's co-workers, none of whom is disabled, also received one unsatisfactory rating, and two of the co-workers received identical ratings to Ms. Bailey.  DSMF ¶ 69.  Mr. Pinkham's notes on Ms. Bailey's performance evaluation stated "unsafe worker, poor performance and attendance," and he also checked "no" under "[w]ould [y]ou [r]ecommend [t]his [p]erson for [r]ehire or [r]etention."  DSMF

---

[13]   The Postmaster General concedes for the purpose of summary judgment that Ms. Bailey has a disability and is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of her job.  *Def.'s Mot.* at 8 n.4.

¶ 52-53, 62; *Pl.'s Second Mot.*, Attach. 7, *Employee Evaluation and/or Probationary Report* at 15; *see Interrogs.* at 4.

Ms. Bailey's timecards and statements, however, corroborate that she switched a shift for a hip injection, left early one day due to illness, missed work on December 19, and was marked AWOL on Christmas, all within the short temporary worker holiday appointment period. DSMF ¶¶ 54-57. Thus, based on her attendance alone, the record provides strong evidence for Mr. Pinkham to reasonably believe that Ms. Bailey deserved one unsatisfactory rating on her performance evaluation.[14] Moreover, Mr. Pinkham's comparable evaluations of three of Ms. Bailey's co-workers who are not disabled demonstrate that his evaluation of Ms. Bailey lacks a discriminatory animus. DSMF ¶ 69. Ms. Bailey's "disagree[ment] with [her supervisor's] assessment of [Plaintiff's] relative performance . . . is not sufficient to create a triable issue." *Compton v. GTE Gov't Sys.*, C.A. No. 93-11383 MLW, 1995 U.S. Dist. LEXIS 20040, at *18 (D. Mass. Dec. 7, 1995).

Similarly, regarding Ms. Bailey's early separation and non-selection for the available USPS position, Ms. Bailey was not singled out as the only temporary worker not provided with the opportunity to work an extra week and/or to continue working at USPS beyond the temporary holiday appointment period. In fact, three of Ms. Bailey's ten co-workers were likewise separated from employment on December 28, 2017, as the Christmas mail rush began to subside, DSMF ¶ 91, and the remaining temporary workers were separated by January 5, 2018, just one week after Ms.

---

[14] Based on its obligation to view the facts in the light most favorable to Ms. Bailey, the Court assumes that Ms. Bailey had a good reason for each of her absences.

Bailey's separation.  DSMF ¶ 98.  Moreover, only one temporary worker was selected to continue employment at USPS, and this temporary worker received very strong performance evaluations.  DSMF ¶¶ 100-01.

Because Ms. Bailey was treated in a similar fashion to many of her co-workers and does not meet her burden of proving that Mr. Pinkham and USPS's legitimate reasons for providing her with one unsatisfactory rating, separating her one week before the latest end date of her appointment, and not hiring her for continued employment at USPS were pretextual, the Court grants summary judgment to the Postmaster General on Ms. Bailey's disparate treatment claim.

### B.    Reasonable Accommodation Claim

Ms. Bailey claims that she requested and was granted an accommodation during her temporary work position at USPS.  PSAMF ¶ 22.n.  She further claims that she asked for information on how to request an accommodation for the Postal Exam and received no response regarding how to do so.  *Pl.'s Second Mem.* at 29.  The Court concludes Ms. Bailey does not have a valid reasonable accommodation claim because during her temporary employment at USPS she was granted her requested accommodation and Ms. Bailey made no specific request for an accommodation to take the Postal Exam.

### 1.    Legal Standard

To prove a failure to accommodate claim, Ms. Bailey must show: "(1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) that [USPS], despite knowing of [her] disability, did not reasonably accommodate it."

*Burnett v. Ocean Props.*, 422 F. Supp. 3d 369, 384 (D. Me. 2019) (citing *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003) (citations omitted)).

Ms. Bailey bears the initial burden of making a sufficiently direct and specific request for a reasonable accommodation, unless the employer otherwise knew that one was necessary. *See Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012) ("Where a plaintiff alleges a failure to accommodate, the plaintiff must show that the employer knew about plaintiff's disability and did not reasonably accommodate it"). "'The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation.'" *Id.* (quoting B. LINDEMANN & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW ch. 5. III, at 269 (4th ed. 2007) (internal citation omitted)). Putting an employer on notice means "not only notice of a condition, but of a 'causal connection between the major life activity that is limited and the accommodation sought.'" *Id.* (quoting LINDEMANN & GROSSMAN, ch. 13.VI.D.1, at 880 (internal citation omitted)).

### 2.   Analysis

Ms. Bailey alleges two instances in which she either requested an accommodation or information regarding a potential future accommodation. Ms. Bailey claims that at the start of her temporary employment at USPS, she requested an accommodation to use her notebook application or have instructions repeated. *Compl.* at 5; DSMF ¶¶ 26, 29. Ms. Bailey confirms that each of her supervisors agreed that that she could use the notebook application so long as she did not use her phone for any other purpose while on the floor. DSMF ¶¶ 25, 27-28; PSAMF ¶ 22.n. She then used the application "every day" during her month-long employment. DSMF ¶

46

32.   Because USPS granted Ms. Bailey's request for accommodation, the Court concludes that Ms. Bailey's unreasonable accommodation claim is not valid.  Ms. Bailey thereby cannot meet the third requirement of an unreasonable accommodation claim that "despite knowing of [her] disability, [USPS] did not reasonably accommodate it."  *Burnett*, 422 F. Supp. at 369.

To the extent Ms. Bailey alleges a reasonable accommodation claim regarding her postal exam accommodation request, the Court concludes her claim is likewise invalid because according to Ms. Bailey herself, she "never asked for a specific accommodation for the Postal Exam [because she] could find no one when [she] said [she] needed the accommodations . . . [she] got the same answer from everyone, there is no Personnel Department."  *Pl.'s Second Mem.* at 29.  Ms. Bailey does not allege that she ever requested any specific accommodation for the postal exam.  Because Ms. Bailey did not request an accommodation but instead asked only for information on how to later request an accommodation, she did not make a "sufficiently direct and specific" reasonable request linked to her disability as required under the Rehabilitation Act.  *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012); *see, e.g.*, *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017) ("The burden is on [the plaintiff] to demonstrate in the first instance what specific accommodations she needed and how those accommodations were connected to her ability to work"); *Navedo v. Nalco Chem., Inc.*, 848 F. Supp. 2d 171, 188 (D.P.R. 2012) ("Because [the plaintiff] does not specify what kind of accommodation he

requested, his assertion that he requested an accommodation and that it was, in fact, 'reasonable' is entirely conclusory").

Because Ms. Bailey cannot sustain a reasonable accommodation claim based on either her temporary employment accommodation or her request for information regarding how to make an accommodation request for the postal exam, there is no genuine issue of material fact and the Court thereby grants the Postmaster General's motion for summary judgment on Ms. Bailey's reasonable accommodation claim.

## C.    Hostile Work Environment Claim

Ms. Bailey argues that she was subjected to a hostile work environment due to "[Mr. Pinkham] making derogatory or intimidating references to [her] mental or physical impairment," specifically because he "followed through on his threat that [she] would not be hired if [she] insisted on filling out the accident report."  *Pl.'s Second Mem.* at 32.  The Court concludes that the unfortunate treatment experienced by Ms. Bailey does not rise to the high legal standard required to sustain a hostile work environment claim.

### 1.    Legal Standard

Pursuant to the Rehabilitation Act, "'[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . conducted by . . . the United States Postal Service.'" *Rolland v. Potter*, 492 F.3d 45, 47 (1st Cir. 2007) (quoting 29 U.S.C. § 794(a)).

In order to succeed on her hostile work environment claim, Ms. Bailey must show the following:

> (1) she was disabled as defined under the Rehabilitation Act, (2) she was subjected to uninvited harassment, (3) her employer's conduct was based on her disability, (4) the conduct was so severe or pervasive that it altered the conditions of her work and created an abusive work environment, and (5) the harassment was objectively and subjectively offensive.

*McDonough v. Donahoe*, 673 F.3d 41, 46 (1st Cir. 2012) (citing *Prescott v. Higgins*, 538 F.3d 32, 42 (1st Cir. 2008).

Although "[t]here is no mathematically precise test," *Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013), the "standards for judging hostility are sufficiently demanding" and require "conduct [to] be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. An actionable hostile work environment exists only where the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). "Rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005).

### 2.   Analysis

Based on the record before the Court—even assuming Mr. Pinkham's conduct was based on Ms. Bailey's disability, an assumption contradicted at times by Ms. Bailey's own affidavits stating the hostile conduct was due to her filing of a safety

report[15]—the Court concludes that Ms. Bailey has failed to show Mr. Pinkham's conduct was "sufficiently severe or pervasive [that it] alter[ed] the conditions of [her] employment and create[d] an abusive working environment." *Harris,* 510 U.S. at 21.

The First Circuit has concluded that summary judgment is appropriate where the alleged conduct is episodic and the alleged harassment does not amount to more than "the ordinary tribulations of the workplace." *Vera v. McHugh*, 622 F.3d 17, 26-27 (1st Cir. 2010) (internal citation and quotation marks omitted). The "standards for judging hostility are sufficiently demanding" and require "conduct [to] be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. 775 at 788.

The First Circuit elaborated on these stringent standards in *Alvarado v. Donahoe*, 687 F.3d 343 (1st Cir. 2012). In *Alvarado*, the First Circuit held that a USPS employee-plaintiff's complaint alleging his supervisor had given him harassing work instructions and his co-workers had publicly mocked his mental disability or threatened his employment status fell "markedly short" of establishing a hostile work environment. *Id.* at 461-62. The plaintiff alleged that his supervisor made "derogatory remarks to [him] about his mental health such as '[t]ake your pills' and '[y]ou really don't know about real problems,' which [he] felt were intended to belittle his condition." *Id.* at 455. Despite the fact that one of the plaintiff's supervisors

---

[15]    *See* DSMF ¶ 116 ("As retaliation for the unsafe work condition and safety concern, [Mr. Pinkham] then put me alone on a job . . . ."); DSMF ¶ 49 ("As far as I was concerned he started to retaliate once I had finished this [accident] report"); DSMF ¶ 49 ("the retaliation for bringing up safe work conditions with the cage"); DSMF ¶ 48 ("[Mr. Pinkham] tried to threaten me into not filing an accident report, then retaliating when I did"); DSMF ¶ 64 ("[Mr. Pinkham] retaliating. He let me know that he now knew about my reporting of unsafe work conditions and that he treated me punitively and tried to discourage me from filing a work place injury report").

allegedly told him, "crazy, crazy, you're crazy" when he provided the supervisor with documents relating to his recurrent schizoaffective disorder, *id.* at 462, the *Alvarado* Court found that such conduct fell "markedly short" of creating a hostile work environment. *Id.* at 461; *see Dickinson v. UMass Meml. Med. Group*, Civil Action No. 09-40149-FDS, 2011 Dist. LEXIS 30932, at *41 (D. Mass. Mar. 24, 2011) (holding the plaintiff had not "come close to [establishing] sufficiently severe or pervasive harassment" despite alleging four instances of name-calling by his supervisor and his supervisor referring to the plaintiff as "foolish" and "stupid" and twice calling the plaintiff an "idiot").

Here, Ms. Bailey alleges that Mr. Pinkham "daily from the time [she] attempted to correct the safety issue that occurred on the first or second day on the plant floor until [her] final termination harassed [her], attempted to intimidate, threatened with negative employment outcomes and followed through to dissuade [her from her] legal right to report an injury caused by the careless neglect of [her] supervisor." *Pl.'s Second Mem.* at 25-26. She submits that Mr. Pinkham "was determined to find any and all excuses to put [her] in an inappropriate workspace, in unsafe work conditions, deny [her] training, threaten [her] job and future employment, deny [her] section appropriate staffing, and alter workplace document with untrue statements." *Id.* at 14. She explains how she "was not trained on a device that required 3-4 prompts and had to endure repeatedly insults in front of other workers from [Mr. Pinkham] when [she] had to retrieve him to program the device to independently do [her] job." *Id.* at 12.

51

The Court concludes that Ms. Bailey's alleged treatment by Mr. Pinkham—although as she describes it was unpleasant, inappropriate, and unjust—is not notably more severe than that discussed by the *Alvarado* Court.  Because the First Circuit determined that the behavior by the USPS supervisor in *Alvarado* fell "markedly short" of creating a hostile work environment, the Court thereby concludes that Mr. Pinkham's behavior is not sufficient to sustain Ms. Bailey's hostile work environment claim.  687 F.3d at 461.  Because there is no genuine issue of material fact, the Court grants summary judgment to the Postmaster General on Ms. Bailey's hostile work environment claim.

### D.   Retaliation Claim

Ms. Bailey alleges that Mr. Pinkham retaliated against her after she brought up her safety concerns and injury by refusing to train her to use a workplace device, *Pl.'s Second Mem.* at 12, limiting the roles she could participate in at work, PSAMF ¶ 22.t, and separating Ms. Bailey approximately ten days before the set date beyond which she was told her position would not extend.  DSMF ¶ 91, 98.  The Court concludes that Ms. Bailey cannot sustain her retaliation claim based on the limited scope of the alleged retaliatory acts that the Court may consider and USPS's legitimate nondiscriminatory reason for Ms. Bailey's separation.

#### 1.   Legal Standard

To make out a prima facie case of unlawful retaliation, an employee must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action after or contemporaneous with such activity; and, (3) there existed a causal

link between the protected activity and the adverse job action. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003); *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994); *Bishop v. Bell Atlantic Corp.*, 143 F. Supp. 2d 59, 62 (D. Me. 2001). When a prima facie case of retaliation is established, the retaliation claim follows the *McDonnell-Douglas* burden-shifting framework, there is an inference of discrimination, and "the burden of production shifts to the defendant to produce evidence 'that the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" *Cham v. Station Operators, Inc.,* 685 F.3d 87, 94 (1st Cir. 2012) (quoting *Hicks*, 509 U.S. at 507).   If the defendant does so, "'the burden shifts back to the [plaintiff] to produce evidence that the . . . employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment [decision].'" *Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768 (quoting *Trott*, 2013 ME 33, ¶ 15, 66 A.3d 7).

## 2.   Analysis

Although Ms. Bailey alleges that she experienced retaliation for bringing up her safety concerns and filing an accident report against Mr. Pinkham,[16] raising safety concerns is not a protected activity under the Rehabilitation Act and thereby cannot form the basis for a retaliation claim. *See, e.g.*, *Young v. Brennan*, Civil Action No. 16-12001-FDS, 2017 U.S. Dist. LEXIS 70032 at *15-16 (D. Mass. May 8, 2017) ("Filing such a[n accident] report . . . does not constitute a protected activity . . ..").  Because Ms. Bailey did not initiate any EEO action until December 27, 2017, the

---

[16]    Ms. Bailey alleges that she was retaliated against for "reporting injury + safety concerns," DSMF ¶ 129, and "for both bringing up a safety concern and being injured," DSMF ¶ 133.

Court limits its analysis to the allegedly retaliatory action that occurred after December 27, 2017.[17]  *See Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006) ("The relevant conduct is that which occurred <u>after</u> [the plaintiff] complained about his superiors' [discriminatory conduct]" by "filing a harassment complaint with the Postal Service's Equal Employment Office") (emphasis in original); *Young*, 2017 U.S. Dist. LEXIS 70032 at *16 ("Plaintiff also filed an EEO complaint on June 22, 2011, which is a protected activity.  However . . . [b]ecause plaintiff's discharge occurred prior to the protected activity—the filing of the EEO complaint—the complaint fails to state a plausible claim for retaliation . . ..").

The only allegedly retaliatory action Ms. Bailey experienced after she engaged in a protected activity is her separation on December 28, 2017.  The Court concludes that USPS had a legitimate and non-retaliatory purpose for separating Ms. Bailey, along with three of her colleagues, approximately one week before the latest end date of the holiday appointment period.  *See* DSMF ¶¶ 78, 87-88.  As the Postmaster General contends, temporary workers are hired exclusively for the holiday mail rush and are regularly separated from employment before the final termination date of their appointment.  DSMF ¶ 75.  On December 28, 2017, as the holiday mail rush subsided and in line with its standard practice, USPS separated Ms. Bailey along with three other temporary workers—none of whom based on this record had engaged in a protected activity.  Ms. Bailey has not met her burden of showing that USPS's

---

[17]    Ms. Bailey did not file her EEOC complaint until April 10, 2018.  *EEOC Compl.*  Because she contacted an EEO counselor on December 27, 2017, the Court considers the alleged retaliatory action taken after December 27, 2017 for the purposes of summary judgment.

proffered reason for her separation is pretextual. *See Carnicella*, 2017 ME 161, ¶ 16, 168 A.3d 768.  Because there is no genuine issue of material fact, the Court grants summary judgment to the Postmaster General on Ms. Bailey's retaliation claim.

### E.    Privacy Act Claim

Ms. Bailey claims that she asked for a copy of her performance evaluation from Mr. Pinkham but that he "wouldn't give her a copy."  DSMF ¶¶ 67, 134.  She further claims that Mr. Pinkham altered the evaluation, specifically that he checked "no" under "would you recommend this person for retention or rehire" and added handwritten comments of "unsafe worker, poor performer and attendance" after she had initialed the top half of the evaluation.  DSMF ¶¶ 65, 134.  Ms. Bailey thus appears to be alleging both an access claim and alteration claim under the Privacy Act.  The Court concludes that Ms. Bailey's Privacy Act claim is invalid because Ms. Bailey both failed to exhaust her administrative remedies and cannot otherwise sustain either an access or an alteration claim under the Privacy Act.

### 1.    Legal Standard

The Privacy Act requires that any government agency subject to FOIA provide any person "his record or . . . any information pertaining to him which is contained in [the agency's system of records]."  5 U.S.C. § 552a(d)(1) (2012).  Specifically, the Privacy Act permits an individual to access agency records and request amendment of records contained in a "system of records" believed to be inaccurate.  *See* 5 U.S.C. § 552a(d).  The Privacy Act further provides a civil cause of action to enforce the access and amendment requirements.  *See* 5 U.S.C. § 552a(g).

Though "the Privacy Act does not expressly institute administrative requirements prior to filing a lawsuit," it is well-established that a plaintiff must first "exhaust his administrative remedies [by following] the procedures adopted by that agency." *Mumme v. DOL*, 150 F. Supp. 2d 162, 169 (D. Me. 2001).[18]  USPS regulations instruct claimants how to fashion their Privacy Act requests.  *See* 39 C.F.R. § 266. Specifically, among other requirements, "[i]nquiries regarding the contents of records systems or access or amendment to personal information" must be submitted in writing and clearly marked "Privacy Act Request."  39 C.F.R. § 226.5.  USPS is then given an opportunity to respond.  *Id.*

When Privacy Act claims fall within the meaning of "prohibited personnel practices" under the Civil Service Reform Act of 1978 (the CSRA), federal courts are precluded from considering such claims.  *See Vessella v. Dep't of Air Force*, No. 92-2195, 1993 U.S. App. LEXIS 15449, at *4 (1st Cir. June 28, 1993) (the Privacy Act "cannot be used[] to frustrate the exclusive, comprehensive scheme provided by the CSRA" by providing a secondary route by which to challenge a personnel decision). The CSRA provides that "any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . take or fail to take . . . a personnel action with respect to any employee because of any disclosure of information by an employee or applicant which the

---

[18]      In *Mumme*, the district court wrote that "[t]he Privacy Act does not expressly institute administrative requirements prior to filing a lawsuit.  Thus, for plaintiffs seeking relief pursuant to the Privacy Act, the exhaustion requirement is jurisprudential rather than jurisdictional."  *Mumme*, 150 F. Supp. 2d at 169; *see Varad v. United States Dep't of the Treasury*, No. 18-91338-RGS, U.S. Dist. LEXIS 136227, at *3 (D. Mass. Aug. 13, 2018).

employee or applicant believes evidences any violation of any law, rule or, regulation."
5 U.S.C. § 2302(b)(8).  If such an action is taken, it is considered a "prohibited
personnel practice."  5 U.S.C. § 2302(a).  Under 5 U.S.C. § 2302, "personnel action" is
defined as including, among other things, "a performance evaluation."  5 U.S.C. §
2302(a)(2)(A)(viii).  The CSRA further provides an exclusive remedial scheme for
employees affected by prohibited personnel practices whereby the employee "may
elect not more than one of the [following] remedies . . . (A) An appeal to the Merits
Systems Protection Board . . . (B) A negotiated grievance procedure under this section
. . . [or] (C) Procedures for seeking corrective action under" 5 U.S.C. § 1211 et seq.,
which governs proceedings before the Office of Special Counsel. 5 U.S.C. § 7121(g).
Courts routinely conclude that performance evaluations with which an employee does
not agree fall within the definition of "prohibited personnel actions," and because the
employee has remedies under the CSRA, any Privacy Act claims challenging the same
evaluations are preempted by the CSRA.  See *Doe v. FDIC* 545 F. App'x 6, 8 (2d Cir.
2013); *Walia v. Holder*, 59 F. Supp. 3d 492, 508-09 (E.D.N.Y. 2014).

Additionally, claims relating to the non-correction of a plaintiff's performance
evaluation generally fall outside the scope of the Privacy Act.  This is because "[t]he
Privacy Act allows for correction of facts but not correction of opinions or judgments."
*McCready v. Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006) (citation omitted).  Courts also
routinely reject plaintiffs' Privacy Act claims that collaterally attack the same
discrimination claims.  *See Barhorst v. Marsh*, 765 F. Supp. 995, 999 (E.D. Mo. 1991)

(the "Privacy Act is not a 'springboard for launching a collateral attack on federal personnel management decisions").[19]

### 2.   Analysis

As an initial matter, Ms. Bailey has not exhausted her administrative remedies, as the law requires claimants to do under the Privacy Act. *See Mumme*, 150 F. Supp. 2d at 169 ("The Privacy Act does not expressly institute administrative requirements prior to filing a lawsuit. Thus, for plaintiffs seeking relief pursuant to the Privacy Act, the exhaustion requirement is jurisprudential rather than jurisdictional") (citing *Taylor v. United States Treasury Dep't*, 127 F.3d 470, 475-77 (5th Cir. 1997). Ms. Bailey did not submit a Privacy Act request in writing requesting access or amendment to her performance evaluation in accordance with USPS's procedures. *See* 39 C.F.R. § 226.5 ("[i]nquiries regarding the contents of records systems or access or amendment to personal information" must be submitted in writing and clearly marked "Privacy Act Request"). Because she has not administratively exhausted either her access or alteration claims, the Court must grant summary judgment against these claims.

---

[19]    In its motion, the Postmaster General argues that the Privacy Act authorizes suits only against an "agency" and implies that the USPS is not an agency under the Act. *Def.'s Mot.* at 29 ("Finally, the Privacy Act authorizes suit only against an 'agency' 5 U.S.C. § 552a(g)(1), as defined in 5 U.S.C. § 552(e)"). First, the Postmaster General miscited the correct provision defining agency. It is found in 5 U.S.C. § 552(f)(1), not § 552(e). Second, the Postmaster General has not cited any caselaw supporting its view that the USPS is not an agency under the Privacy Act. Courts, including this one, have determined that the USPS is a governmental agency for purposes of Title VII. *See Oakstone v. Postmaster Gen.*, 397 F. Supp. 2d 48, 58-62 (D. Me. 2005) (noting that the USPS is something of a statutory chameleon). It may or may not be that the USPS is a government agency under the Privacy Act definition, but the USPS has not demonstrated that it is a government agency for purposes of the Privacy Act in its motion and the Court leaves that issue for another day.

Skipping over for the moment Ms. Bailey's failure to exhaust her administrative remedies, however, her privacy act claims are not valid here. First, to the extent Ms. Bailey brings an access claim under the Privacy Act, this claim is moot because Ms. Bailey was in fact provided with a copy of her evaluation in both her EEO proceeding and this litigation. *See* DSMF ¶ 74. Second, regarding Ms. Bailey's alteration claim, USPS's "non-correction" of her performance evaluation falls outside the bounds of a Privacy Act violation because her disagreement with her performance evaluation falls squarely within the definition of "prohibited personnel practice" and is thus preempted by the CSRA. 5 U.S.C. § 2302(a). *See Vessella*, 1993 U.S. App. LEXIS 15449, at *4 ("The Privacy Act permits an individual to seek correction of an agency's inaccurate or incomplete records and other relief in defined circumstances. It cannot be used, however, to frustrate the exclusive, comprehensive scheme provided by the CSRA for federal employee challenges to adverse agency personnel decisions; *Walia*, 59 F. Supp. 3d at 508-09 ("[The CSRA] provides that any 'employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . take . . . a personnel action with respect to any employee . . . because of . . . any disclosure of information by an employee . . . which the employee . . . reasonably believes evidences . . . any violation of any law, rule or regulation' . . . [and i]f such a personnel action is taken, it is considered a 'prohibited personnel practice'") (quoting 5 U.S.C. § 2302(b)(8) and (a)).

Because Ms. Bailey did not exhaust her administrative remedies, her access claim is moot and because her alteration claim falls outside the bounds of a Privacy Act violation, the Court concludes that there is no genuine issue of material fact and grants summary judgment to the Postmaster General on Ms. Bailey's Privacy Act claims.

## VI.   SUMMARY

The Court concludes that Ms. Bailey has not plausibly alleged her disparate treatment, reasonable accommodation, hostile work environment, or retaliation claims.  She likewise has not plausibly alleged her claim under the Privacy Act.

## VII.   CONCLUSION

The Court GRANTS the Postmaster General's motion for Summary Judgment (ECF No. 88).  The Court DISMISSES without prejudice Ms. Bailey's Rebuttal of All Matters and Addressing the Court (ECF No. 89).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2023